# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 2178 - & 98 C 2550 | **DATE** | 4/15/2003 |
| **CASE TITLE** | Reynolds, et al. vs. Beneficial National, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order declining to approve the settlement proposed to this court. Settlement counsel will not be allowed to continue to represent the class in this case. Other counsel seeking to represent the class shall be prepared to make a presentation at the status hearing **set for 5/2/03 at 10:15 a.m.**

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | 34 | **Document Number** |
| | No notices required. | number of notices | |
| ✓ | Notices mailed by judge's staff. | APR 16 2003 | |
| | Notified counsel by telephone. | date docketed | 118 |
| | Docketing to mail notices. | docketing deputy initials | |
| | Mail AO 450 form. | 4/15/2003 | |
| | Copy to judge/magistrate judge. | date mailed notice | |
| MPJ | courtroom deputy's initials | MJ6 | |
| | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| CHERYL REYNOLDS and NANNIE TRIPLETT, on behalf of themselves and all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 98 C 2178 |
| BENEFICIAL NATIONAL BANK, BENEFICIAL TAX MASTERS, INC. and H & R BLOCK, INC., | ) ) ) ) | |
| Defendants. | ) ) | |
| DECARLO TURNER, on behalf of herself and all the class of similarly situated borrowers, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 98 C 2550 |
| BENEFICIAL NATIONAL BANK and BENEFICIAL TAX MASTERS, | ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This case is before me on remand from the Seventh Circuit pursuant to local Circuit Rule 36. *Reynolds v. Beneficial National Bank*, 288 F.3d 277 (7th Cir. 2002). In that decision the Seventh Circuit concluded that the circumstances surrounding the settlement of this litigation were suspicious and that it did not have enough information to determine if the settlement was fair. Lawyers for proponents of the settlement and objectors

have filed various papers before me and presented argument and witnesses on three days. I decline to approve the settlement.

Two complaints were filed in April, 1998. The first, 98 C 2178, was brought by Joel Zawikowski, Cheryl Reynolds, Debra Barnes, Phyllis Barnes and Nannie Triplett against Beneficial National Bank, Beneficial Tax Masters, Inc., H&R Block, Inc. and various H&R Block subsidiaries. That complaint alleged violations of the federal Truth in Lending Act ("TILA," 15 U.S.C. § 1601, et seq.), state consumer fraud statutes, breaches of contractual and fiduciary duties, and unjust enrichment. On April 28, 1998, DeCarlo Turner filed a separate complaint, No. 98 C 2550, against Beneficial National Bank and Beneficial Tax Masters, Inc., alleging violations of TILA, RICO, 18 U.S.C. § 1961, et seq., and state consumer fraud statutes as well as breach of contract. The Zawikowski plaintiffs were represented by Francine Schwartz, Jennifer Sprengel, Dominic Rizzi, and Marvin Miller at the time the case began. A few weeks later, Howard Prossnitz filed an appearance on behalf of Nannie Triplett. Turner was represented by Daniel Harris. Both complaints were filed as class actions. The Turner class was defined as all persons who obtained Refund Anticipation Loans (defined below) from Beneficial National Bank from January 1, 1994 to the present, with the exception of persons who obtained their loans through Jackson Hewitt (those claims having

2

previously been settled). The Zawikowski class claims were broader, going back to 1987 for certain claims against Beneficial and as to Block from 1996.

In essence, the complaints allege that plaintiffs - who are as a class described in pleadings or opinions in related cases, as persons who are unsophisticated, of limited education, financially strapped, and sometimes elderly - were led to believe they were obtaining a quick income tax refund through defendants' services, while in reality they were signing documents and obtaining a loan (a Refund Anticipation Loan or "RAL") at very high interest rates, without proper timely disclosures. Among the alleged misrepresentations or failures to disclose were the real finance charges they were paying and the fact that their tax preparer in the case of Block was receiving part of that fee.

The history of these cases was summarized in the Seventh Circuit opinion. The defendants moved to dismiss the complaints. In response, in part, plaintiffs voluntarily dismissed all but one of the Block defendants. The remainder of the motion to dismiss the Zawikowski complaint was briefed and granted in part by Judge Zagel in January and February, 1999. Judge Zagel denied defendants' motion to dismiss the Turner complaint in March, 1999. In October, 1999, the plaintiffs and defendants, including Block although it had been dismissed, filed a proposed settlement agreement with the court. That settlement would pay each class

member (broadly defined in a new "settlement class") who filed a claim a pro rata share of a $25,000,000 claim fund up to a maximum of $15.00, with any remaining amount to revert to defendants. Judge Zagel required that the cap be raised to $30.00 for claimants who had more than one RAL, and disallowed the reversion. Following hearing, to which there were objections by lawyers representing plaintiffs in actions pending in other jurisdictions whose actions would be extinguished by the settlement, the settlement, as amended, was approved. The Seventh Circuit reversed.

On remand, the proponents of the settlement have vigorously argued for its renewed approval. Initially, I severed two classes that the Seventh Circuit found to be improperly included within the settlement, the Peterson and Carbajal classes, whose claims were different from those alleged by the settlement class but who had been included in the final settlement at the insistence of Block. I also refused to enter a new injunction (the old one had been vacated by the Seventh Circuit) enjoining proceedings in a Texas case, *Haese v. H&R Block, Inc.*, et al., which was set for trial in the fall of 2002. I held a fairness hearing on October 7 and 8 and, at the request of objectors, a further hearing on November 15, 2002. At those hearings, and in legal memoranda, the proponents of the settlement have attempted to show, through purported legal experts (I accepted their

opinions as additional briefs but not as expert opinions) and economic experts whose opinions were based on the legal conclusions of the law professor "experts", that the $25,000,000 settlement is quantifiably fair. Objectors have focused on what they say is proof that the class was sold out by unscrupulous counsel, which they say prevents the settlement from being approved regardless of the amount, although they also argue that the cases against these defendants are worth far more than $25,000,000.

It is settled law that a class action settlement cannot be approved, regardless of objective fairness, if the requirements of Fed. R. Civ. P. 23, including adequacy of counsel, are not met. *Anchem Products, Inc. v. Windsor,* 521 U.S. 591, 621-22 (1997); *Reynolds,* 288 F.3d at 284. Theoretically, if the settlement is fair, adequacy might be assumed. But as has often been noted, once a settlement is agreed upon, counsel, adequate or not, will, as in this case, argue for the fairness of the settlement. The court, therefore, does not have the benefit of the adversarial argument that should enable it to reach an objective conclusion on the fairness of the settlement. *See, e.g., Kamilewicz v. Bank of Boston Corp.,* 100 F.3d 1348, 1352 (7th Cir. 1996)(Easterbrook, J., dissenting on request for rehearing en banc) ("Representative plaintiffs and their lawyers may be imperfect agents of the other class members—may even put

5

one over on the court, in a staged performance."). Objectors may provide some balance but in most cases they are probably reluctant to commit the substantial resources that may be needed, knowing that they may not see reimbursement.

In this case the Seventh Circuit noted that the lawyers' "representation of the class was almost certainly inadequate, an independent reason for disapproving a settlement" (288 F.3d at 284) but nevertheless sent the case back for a further examination of the settlement. Given the requirement of adequacy, noted by the Court, I conclude that it simply did not find it had sufficient information to make a definite determination of adequacy. Both sides have pursued the inquiry on remand.

The Seventh Circuit's tentative conclusion of inadequacy cited a lack of discovery, the fact that various classes were included in the settlement that did not seem appropriate, the inclusion of Block, who was not even a defendant, without additional compensation to the class, and various actions, particularly a meeting between certain counsel for plaintiffs and counsel for defendants, several months before the suits were filed. The meeting in question was a lunch at a Chicago club in September, 1997. The meeting was arranged by Ms. Schwartz, one of plaintiffs' counsel. With her was Mr. Prossnitz and Mr. Harris. Also present were Burt Rublin, Beneficial's lead lawyer

and James Adducci, also a lawyer for Beneficial. The Seventh Circuit noted that no suit was pending against Beneficial at the time, that it was questionable whether Ms. Schwartz or Mr. Prossnitz had a client who might be a prospective plaintiff, and that Mr. Harris "certainly ... did not." Id. at 280-81. Nevertheless, counsel arranged the lunch to discuss the possibility of a global settlement of RAL litigation. At the lunch, Mr. Harris later testified, Mr. Rublin "threw out a number, for purposes of illustration, of $24 or $25 million" as a possible settlement figure. Id. at 281. While the case did not settle very soon after this, and indeed was not filed until the following April, the Seventh Circuit found the coincidence of the numbers thrown out by Mr. Rublin with the final settlement figure, and the fact that the lawyers actually agreed to an amount that was likely to be considerably less than that, particularly troublesome, especially given the other facts noted above.

On remand, proponents of the settlement argue that the Seventh Circuit was mistaken, and that Mr. Rublin did not mention even a possibility of settlement in the range of $25 million. Both Mr. Rublin and Mr. Adducci testified that no such conversation occurred. Mr. Prossnitz also testified, somewhat less assuredly, stating that he did not recall Mr. Rublin mentioning such a number. Mr. Harris, whose deposition testimony

7

had been relied upon by the Seventh Circuit as well as by Judge Zagel, did not testify. Neither did Ms. Schwartz. I am not certain that the Seventh Circuit's finding in this regard is even open to question (indeed, opponents of the settlement say that the Seventh Circuit at oral argument asked Mr. Rublin if he would like them to remand the case for a hearing before Judge Zagel, at which he could testify under oath in contradiction to Mr. Harris' testimony, and Mr. Rublin turned down the offer), but the luncheon would appear to be mostly of evidentiary interest in examining the general adequacy of counsel in this case. What is particularly important about the lunch was that counsel for plaintiffs, months before they filed a case, and without in some cases even clients to represent,[1] indicated their interest in an early settlement.

Additional facts of record also are relevant to the representation issue. Mr. Prossnitz and Ms. Schwartz had represented plaintiffs in an earlier RAL suit in federal and then state court against Beneficial and another tax return preparer, Jackson Hewitt. *Adams v. Jackson Hewitt, Inc.,* 95 CH 11825 (Cir.

---

[1] Settlement proponents also dispute the Seventh Circuit finding that they did not have clients. But Mr. Harris had initially testified that he did not have a client at the time, and the Seventh Circuit so found. Ms. Schwartz' briefs in the Seventh Circuit documented the fact that she purchased a client for a $100,000 referral fee and her time records indicate a retainer agreement was sent to plaintiff Reynolds after the Sept. 3 Metropolitan Club lunch.

Ct. Cook Cty.). The federal case had been dismissed but the state court case had survived a motion to dismiss. It had gone up to the state appellate court on a discretionary appeal, to which plaintiffs' counsel had agreed. But in the appellate court they nevertheless opposed allowing the appeal, and the state trial court held that it would impose sanctions in the form of defendants' attorneys' fees. Immediately following this order, and before a monetary amount of sanction could be imposed, plaintiffs' counsel agreed to settle the case. The settlement purported to give Jackson Hewitt a nationwide release of all RAL claims over a three year period in return for $75,000 in attorneys' fees, agreed dismissal of the sanctions order, and a $15 credit towards the cost of future tax preparation service to anyone who sent in a claim form. Notice of this settlement (which essentially gave plaintiffs nothing[2]) was to be a one time notice in USA Today. Plaintiffs' counsel also agreed not to issue press releases or talk to news media about the lawsuit or

---

[2] *See, e.g. In Re General Motors Corp. Pick-up Truck Fuel Tank,* 55 F.3d 768, 803 (3d Cir. 1995)("the fact that the settlement involves only non-cash relief ... is recognized as a prime indicator of suspect settlements"); *In re Mexico Money Transfer Litigation,* 267 F.3d 743, 748 (7th Cir. 2001)(fact customers got coupons is "enough to raise suspicions—especially because coupons serve as a form of advertising for the defendants, and their effect can be offset ... by raising prices during the period before the coupon expires." In that case, however, the coupons were useful for a service – making wire transfers to Mexico – which plaintiffs used on average of 14 times a year.)

its settlement. After objectors came in, the notice was increased to three times rather than once in USA Today and notice was to be placed in the Chicago Sun-Times as well. Whether counsel had a basis for concluding that a class comprised of people who generally obtained RALs through Jackson Hewitt read USA Today or (apart from Chicagoans) the Chicago Sun-Times is not known. Cf., *Kamilewicz*, 100 F.3d at 1349 (discussing defective notice). At any rate, the settlement was approved. Ms. Schwartz stated in time records submitted to the court in this case that there were "very few claims" made in the case. Mr. Rublin, defendants' counsel from New York, was in Chicago for a hearing on that settlement on the date of the September Metropolitan Club lunch.

After the Metropolitan Club lunch, the three attorneys sent defense counsel the names and social security numbers of their prospective plaintiffs and Mr. Adducci informed plaintiffs' counsel that Beneficial was not interested in a settlement. Within weeks after suit was filed the following April, Mr. Harris contacted Mr. Adducci with a settlement proposal. The proposal was for two $15 coupons to be used for discounts "on charges in connection with a Beneficial loan in the year" 2001 and 2002. Beneficial was to pay $1.6 million in cash (presumably in attorney fees, although on what basis Mr. Harris made the offer is not known because at his deposition he refused to answer any

10

questions about the origin of the offer[3]).  Individual notice was to be given only for persons for whom Beneficial had current addresses.  Beneficial would receive a release of all RAL claims that could have been asserted since the beginning of 1994.  Mr. Harris admits he had obtained no discovery at the time he made this settlement proposal.  Beneficial turned down this offer. However, in January, 1998, after Judge Zagel had denied part of defendants' motion to dismiss, Mr. Rublin contacted Mr. Harris and began settlement negotiations.  Mr. Harris agreed to Mr. Rublin's request not to tell his fellow plaintiffs' counsel about the negotiations until he was given "permission" (his word) to do so by defendants' counsel.  Defense counsel told Mr. Harris they preferred to negotiate with him alone and did not want him to lose control of the discussions.  (Given his earlier indications of willingness to enter into settlement,  it was of course not surprising that defense counsel sought him out.)  At some point Mr. Harris understood that defense counsel wanted to reach a settlement before a class was certified in a New York case, *Affatato v. Beneficial National Bank,* 96 C 5376 (E.D.N.Y.).  He

---

[3] At Mr. Harris' deposition, taken by one of the objecting plaintiffs' counsel in 1999, despite the fact that Mr. Harris was one of the attorneys who owed a fiduciary duty to all plaintiffs in the class, and presumably was to disclose the basis for his assessment that the settlement before Judge Zagel was fair, objections to questions were interposed by counsel for both the settlement proponents and defendants and many questions were unanswered.

also learned that there had been decisions favorable to plaintiffs in RAL litigation involving Beneficial or Block or both in various state and federal courts in 1999. He learned as well that if there was a settlement it would include Block although Block was no longer a defendant in the Chicago cases.

With Messrs. Miller, Prossnitz, and Harris and Ms. Schwartz (the "settlement lawyers") in the two cases before this court eventually involved in the negotiations, counsel reached the settlement that was submitted to Judge Zagel in October, 1999. Essentially all of the efforts of counsel between January and October that went into this case concerned settlement. On August 10, 1999, counsel told Judge Zagel that they had reached a settlement in principle, but negotiations continued concerning the exact language of the agreement, attorneys' fees, and the kind of notice that would be sent. The defendants refused to agree to a procedure where a rebate certificate would be mailed to the class members, insisting that a claim be filed although no information was required for the millions of members known to them. Plaintiffs' counsel agreed to this. There was also some discussion about excluding at least some of the classes in the several state and federal actions in New York, California, Illinois, Pennsylvania, Maryland and Texas, that had survived motions to dismiss and were ongoing, but except for Block class members in Pennsylvania, all were eventually encompassed within

the class. Mr. Harris testified that unless plaintiffs' counsel agreed to a release that would extinguish the rights of plaintiffs in these actions they would not have a deal. At some point two of plaintiffs' counsel, Ms. Schwartz and Mr. Miller, asked for more money if they were going to agree to include a release of Block RALs from Bank One, Greenwood Trust and Mellon Bank (over 10,000,000 RALs according to Mr. Adducci), none of which were defendants but all of which were included in the broad definition of the proposed amended class. Block refused and plaintiffs acquiesced.

On February 19, 2003, prior to reviewing the time records of settlement counsel but concerned with a number of statements in the testimony at the fairness hearing, I ordered settlement counsel to provide a complete list of discovery taken in this case. An examination of the material received in response confirms what I had learned from my subsequent reading of the time records and further study of various testimony while waiting for counsel's submission. In this case, settlement counsel never served a single set of interrogatories, or a formal request for documents, and never took a single deposition of an employee of Beneficial, H&R Block, or any of the other released lenders. They obtained some documents from defendants and answers to some questions; there are, however, no sworn answers or responses. The limited informal discovery sought prior to the time

settlement had been agreed upon consisted in documents or information concerning the named plaintiffs' loans, information about H&R Block's document retention policies, pricing for RALs in various years, Block's license fee, the number of class members, a table with information about electronic filing fees and document preparation fees charged RAL customers in certain years (provided in September, after counsel had informed Judge Zagel that they had reached a settlement). In June, 1999, Mr. Harris had relayed to Mr. Adducci various questions that Ms. Schwartz had told him needed to be answered before she could agree on a settlement. (He stated in his memorandum to Mr. Adducci: "Here are Francine's questions (with some edits).") She wanted to know how many people paid $25, $35 or any other electronic filing fees, how many people paid a higher finance charge than stated in the RAL application, what was this price, what were the document preparation fees, how many people paid them, how many paid these charges when they were not included in the TILA statement, whether there were additional fees or rebates paid to Block and other loan originators, and if so, the total amount paid, the total amount of finance charges paid, Beneficial's and Block's gross income from RALs, whether there was any other category of fee charged besides the document preparation fee and the administrative fee, and who sets and who gets these fees. On July 27, 1999, Mr. Adducci wrote his co-

counsel indicating that Ms. Schwartz had called him that day saying she needed the answers to her questions.  On August 17, 1999, one of Mr. Adducci's co-counsel reported that plaintiffs' expert, Mr. Adler, was going to look at documents to come up with an "economic justification" for the settlement that had been reached.  These were apparently a number of boxes of documents that had been produced in the New York *Affatato* litigation, which Mr. Adducci made available as "confirmatory" discovery. Subsequently, Mr. Adducci reported to Mr. Adler that there was no index or table of contents identifying the contents of the boxes.

 Mr. Adducci purported to respond to Ms. Schwartz' questions in a letter dated September 1, 1999.   In general he referred to two charts on which he said the answers could be found.  The charts contain only the number of persons who paid particular electronic filing fees and "document fee" amounts for Beneficial in particular years.  Subsequently, on October 6, 1999, in response to questions posed in "confirmatory discovery questions" by plaintiffs' expert, Mr. Adducci  said he did not know how many people paid a higher finance charge than the amount stated in the RAL application, nor the amount of the difference between finance charges stated in the RAL application and the actual finance charge, nor how many RAL applications left the finance charge blank.  He also gave numbers that he said were RAL license fees paid to Block by Beneficial in particular tax seasons and saying

it had provided responsive documents. Very little actual
information is provided and the response is, as previously
indicated, unsworn. Settlement counsel did not take Mr.
Adducci's deposition or the deposition of any Beneficial employee
to try to verify even this information.

At some point, plaintiffs' expert (or someone employed by
him or plaintiffs' counsel named Gene Leeb) sought information
from Block concerning materials provided its tax preparers
pertaining to RALs and electronic filing. Louise Ellingsworth,
Block's counsel, responded in a letter dated October 12, 1999,
stating that such information was contained in any of 10 to 14
reference volumes prepared every year and that plaintiffs'
counsel would need to go to Kansas City to look at them or pay
for the material. She also insisted on the entry of a protective
order or signed confidentiality agreement before she would
produce the material. On October 15, Ms. Ellingsworth provided
Mr. Harris with random samples of RAL applications from two
cities. On October 19, Mr. Leeb wrote Ms. Ellingsworth again
requesting copies of training manuals and Block brochures for
various years so that "we may report to the court that our work
is completed." There is no indication the information was
provided. On November 24, 1999, Ms. Ellingsworth wrote Peter
Linden, one of the attorneys for plaintiffs in New York who are
objecting to this settlement, describing the discovery it had

16

provided plaintiffs' counsel as copies of court decisions in RAL cases, the amount of license fees paid by RAL lenders to Block, the total volume of RALs made through Block offices, and the estimated distribution of RALs among various lenders.

In December, 1999, Mr. Adducci wrote Ms. Schwartz two letters in which he said he was answering her questions about the calculation of finance charges in Beneficial RAL loans. On April 7, 2000, it appears that counsel for Block provided someone a list of documents contained in various boxes. While Mr. Miller states in his affidavit that these are a list of documents produced he does not say to whom or when they were produced. By the date, I would guess that if they were produced in this case it was in response to the objectors' formal request for the production of documents.

Settlement counsel did notice depositions in May, 2000 – of the objecting plaintiffs and their counsel.[4] At the same time, they served interrogatories and requests for documents, again on the objecting plaintiffs.

I have not mentioned every item in the response to my February 19, 2003 order. I have, however, reviewed all of it.

---

[4] The only depositions taken in this case were in response to objections to the settlement. In June, 2000, settlement counsel took the deposition of objecting plaintiff Lynne Carnegie and her lawyer, Roger Kirby. Objectors took the depositions of Mr. Harris, Ms. Ellingsworth, and Mr. Adducci and class plaintiffs Turner, Tripplett, and Reynolds.

17

When the material is examined it is clear that despite class counsel's statement that "a large amount of informal discovery was taken in this case," in fact, settlement counsel obtained no sworn or verified discovery in this case. In fact, also, there was very little informal discovery, and almost none before counsel had negotiated and reported to Judge Zagel that they had settled the case. It also does not appear that the more pertinent inquiries (by Ms. Schwartz) were ever answered, and if they were, in unsworn responses, no follow up discovery was taken to verify the responses by counsel. No employees at any defendant were ever deposed as to the numbers provided by defendants or any information at all about what Block or Beneficial (or the other lenders) were told to tell their tax preparation consumers about RALs and electronic filing of tax returns or about what they knew about these consumers and how they marketed to them. Half of the response provided to my order concerns discovery either of objecting plaintiffs or their counsel or discovery sought by them after they intervened to object.

Settlement class counsel attempt to augment the nonexistent discovery in this case by reference to discovery in earlier RAL cases in which they participated. They refer to *Beckett v. H&R Block, Inc.,* 94 C 776 (N.D. Ill.)("Beckett I"), *Beckett v. H&R Block, Inc.,* No. 95 CH 10112 (Cir. Ct. Cook Cty.)("Beckett II"),

and *Adams v. Jackson Hewitt, Inc.,* 95 CH 11825 (Cir. Ct. Cook Cty.). Counsel include copies of document requests made in those cases. However, it appears from the correspondence referring to the requests that the only responses ever obtained to the requests were transactional documents for the named plaintiffs, some Block advertisements for its product and prototype RAL transaction forms. Plaintiffs' counsel also issued formal discovery in the *Adams v. Jackson Hewitt* case, discussed earlier in this opinion, but any discovery responses, and the record before me does not indicate there were any despite counsel's reference to correspondence which is not attached, were once again "confirmatory." Ms. Schwartz, who seems to have done most of the work in the earlier cases, included in her time records for this case her time spent on the earlier cases. While there was substantial time spent drafting pleadings and discovery, there is almost no time documented on reading any responses.

There is one limited exception to the total absence of meaningful discovery disclosed by this record. At the end of August, 1999, class counsel were allowed to examine documents produced in the New York *Affatato* case. Only Ms. Schwartz did so, spending, according to her time records, a substantial part of several days looking at documents. A list of those documents, as well as deposition transcripts from the *Affatato* case, are included in the materials provided to me. I do not know who the

19

deponents were nor can I assess the relevance of those documents. Ms. Schwartz did not testify at the fairness hearing so I do not know what she looked at or what she learned. Whatever their relevance, and however long Ms. Schwartz looked at the documents, she did not learn answers to her questions from her time spent looking at them. A week later, on September 7, 1999, according to her time records, she again told Mr. Harris that she needed answers to her earlier questions. The next day she drafted questions for her expert. There is no indication in her time sheets that she examined any discovery responses after this time.

Ms. Schwartz' time records contain numerous other notations showing that counsel's statement now that they had all the discovery they needed to decide on a fair settlement is untrue. On June 16, 1999, her time records state she had a telephone conversation with Mr. Adducci and adds "can't proceed with settlement without discovery what's going on?" Her time records for July 21, 1999 indicate a court appearance before Judge Zagel at which Mr. Harris informed the court that he and Mr. Prossnitz had accepted defendants' offer of settlement. She says she and an attorney from the Miller firm objected saying "Adducci has not answered my questions regarding fees and number of RALs – how can Harris accept proposal w/o confirmatory discovery; meeting after court w/Harris tell him I'm not on board until I see numbers and my questions are answered." On July 27, 1999, she notes another

telephone conversation with Mr. Adducci, saying "still missing discovery, how can I accept settlement w/o adequate discovery?" Again, on August 10 and 23 she indicates she does not have discovery needed to assess a settlement proposal.

Various statements from other lawyers in this case confirm that Ms. Schwartz' contemporaneous statements that she did not have the discovery necessary to evaluate the fairness of a settlement proposal were more accurate than the statements made to me in counsels' response to my recent order. In his deposition, Mr. Harris admitted that at the time he made his initial settlement offer in the case, he did not have any informal discovery with respect to the claims against Beneficial, further contradicting the present claim that class counsel had obtained discovery in other cases that obviated the need for discovery in this case. On September 21, 1999, Mr. Miller wrote Messrs. Adducci and Rublin regarding a telephone discussion they had about one of the settlement drafts and discussing agreement over terms. In the letter, Mr. Miller also states that they have agreed that "defendants are to provide to plaintiffs' counsel all discovery taken in the other pending actions and such additional discovery as may be reasonably required to evaluate the above terms in light of defense counsel's representations." Despite this, so far as the record shows, documents produced in cases in Maryland (*Green*) and Pennsylvania (*Basile*) cases were not

21

provided to settlement counsel, and there is no indication that counsel insisted on seeing them before agreeing on a settlement.[5]

Settlement counsel nevertheless continue to argue that the settlement in this case is fair and should be approved (with the exclusion, mandated by the Seventh Circuit, of two Illinois cases and, as will be discussed, the Texas case). They say that there was little chance for any recovery, and none exceeding the amount of settlement, if the case had proceeded.

There are two federal claims in the cases before me. The first is a claim under the Federal Truth In Lending Act ("TILA"), 15 U.S.C. § 1601, et seq. The Zawikowski plaintiffs claimed that Beneficial violated TILA through inaccurate disclosures of the amounts paid Block by Beneficial and failing to inform the plaintiff consumers of all of the charges they would incur as a result of obtaining an RAL. Turner claimed Beneficial violated TILA by failing to disclose amounts that were paid to Block or some other tax preparer. In early January, 1999, Judge Zagel

---

[5]At the hearing in this case, when Mr. Miller was confronted with the fact that he did not have a report from his own expert, Dr. Adler, supporting the settlement until December, 1999, he insisted there was a preliminary report. However, he did not produce it to counsel for objectors, nor provide it as a document in support of the settlement. Indeed, settlement counsel decided not to rely on Dr. Adler as their expert in this attempt to obtain approval of the settlement on remand. There is in the record no support for any preliminary report by Dr. Adler, and in the absence of the report, or indeed of plaintiffs' willingness to rely on his final report (thus making him available for deposition), I will not credit the unsupported testimony that there was such a report.

held that the Zawikowski plaintiffs' claim that Beneficial had

failed accurately to state finance charges stated a claim and

that if the amounts paid to Block by Beneficial were on

plaintiffs' behalf there would be liability under TILA.[6]  He

later upheld the Turner complaint, including claims brought under

TILA.

Although defendants argue that plaintiffs have little chance

of prevailing on this claim, settlement counsel state that

plaintiffs stand up to an 80 percent chance of success on their

TILA claims.[7]  Both settlement counsel and defendants focus on

---

[6] Plaintiffs also argued that IRS regulations prohibited an
electronic filer such as Block from accepting fees from the
lender, such as Beneficial, that were contingent on the amount of
the RAL.  Beneficial successfully argued that this claim should
not be considered by Judge Zagel since it was not in the
complaint.  Plaintiffs did not seek to amend their complaint
after entry of this opinion.

[7] Plaintiffs in these cases did not allege a violation of
TILA by another practice, alleged in the Zawikowski complaint to
violate other laws, and alleged in at least one of the other TILA
actions submerged in this settlement.  That alleged practice was
not to inform consumers of statutory mandated disclosures until
they receive the loan check issued by defendants.  While some
courts have upheld this practice, see *Beckett v. H&R Block, Inc.*,
1994 WL 698505 (N.D. Ill. 1994), in denying a motion to dismiss a
TILA claim based on these allegations, Judge Gershon noted that
plaintiffs alleged that because a consumer who completes the loan
application at H&R Block or another tax preparer "1) commits to
paying a charge for having the RAL application considered by the
defendants, even if the application is denied; 2) consents to the
defendants opening up an account in the consumer's name; and 3)
signs Internal Revenue Service Form 8453, which directs the
Internal Revenue Service to forward the consumer's income tax
refund check to that account."  *Affatato v. Beneficial
Corporation*, 1998 WL 472494 at 2 (E.D.N.Y. 1998).  Judge Gershon
agreed with plaintiffs that if proof showed that "these events,

the fact that in the absence of proof of actual damage (which might require individualized proof), damages in class actions under TILA are capped at an amount much less than the settlement in this case. That amount may not be as little as defendant and settlement counsel argue. In a class action, non-actual damages are capped at $500,000 for "the same failure to comply by the same creditor." 15 U.S.C. § 1640(a)(2)(B). The release in this case agreed to by settlement counsel released claims against a number of creditors. Nevertheless, it seems unlikely that any potential TILA recovery would meet or exceed the $25,000,000 settlement.

The settlement encompasses much more than TILA claims. The second federal claim in these actions is a claim under RICO. Plaintiffs allege that defendants' acts in deceiving plaintiffs

---

...effectively bind the consumer to a credit transaction," for instance, by committing the tax refund as collateral for a loan to an account with the defendant, which cannot easily be undone, especially by an unsophisticated consumer, a violation of TILA might be found. Plaintiffs in *Affatato* had moved for summary judgment on all of the TILA claims at the time the settlement in this case ended further proceedings in that case. In their motion they argued that the undisputed facts showed that plaintiffs entered into a contract for the loan subject to either the lender's refusal or plaintiffs' later cancellation at the time they applied for the RAL, that plaintiffs would not have been likely to know at the time their checks were presented that they had an option to cancel, that cancellation would entail costs, not all of which were stated, that the RAL application states that the assignment of the IRS refund check to the lender is irrevocable, and that Block charges RAL customers more than non-RAL customers without disclosing the difference in charge or that it is a finance charge.

in the amount of finance charges they will pay and in failing to disclose Block's interest in the loans constituted a pattern of racketeering with damages, before trebling, that objectors say amounted to $374,000,000. Settlement proponents and defendants dismiss the RICO claim as having no value. But Judge Zagel had denied the motion to dismiss the RICO claim, finding that if the facts showed a bait and switch scheme or intentional false disclosure of payments by Beneficial to Block, plaintiffs could prove a violation of RICO. In this case because of the lack of discovery it is difficult to evaluate the likelihood of proving plaintiffs' claims. However, two other decisions are pertinent to the inquiry regarding this claim. The Pennsylvania appellate court found, in reversing summary judgment in favor of Block in a related case, that the evidence showed that "many of Block's customers had no significant understanding of the 'Rapid Refund' service," and that Block "exploited 'a corresponding opportunity to abuse [their] trust for personal gain.'" *Basile v. H & R Block, Inc.,* 777 A.2d 95, 106 (Sup. Ct. Pa. 2001). In a second case, in December, 2002, in a case brought by the New York City Department of Consumer Affairs, Block agreed to pay New York City Block customers at least $35.00 each (17,500 of those customers receiving coupons redeemable for cash in the amount of $70.00). The Department in that case charged Block with engaging in misleading and deceptive trade practices, and violating earlier

agreements to discontinue the practice of failing "to distinguish between its rapid refund products and refund anticipation loans."[8]    If true, the allegations in the New York case and the evidence referred to in *Basile* would support plaintiffs' claims of intentional ongoing fraud.   Notably, neither defendants nor settlement counsel have discussed the merits of the RICO claim, merely noting that, contrary to Judge Zagel (whose opinion they neglect to mention), some other courts have dismissed RICO claims.[9]   While at this stage of the proceedings (in which settlement proponents never addressed the facts and the record

---

[8] Block agreed to pay additional fines and costs, to the entry of an injunction, and to pay the cost of an independent monitor to oversee Block's compliance with advertising and training materials.

[9] One of those cases, *Peterson v. H & R Block Tax Services, Inc.*, 22 F. Supp. 2d 795 (N.D. Ill. 1998), was on summary judgment and not a motion to dismiss.  The facts were different, involving Block's  negligent action in failing to detect, over a period of a few weeks, the fact that customers claiming earned income tax credits would not receive a quick refund from the IRS. Both the period of duration and the finding of negligence, the two facts upon which Judge Castillo based his decision, distinguish the case from the claim, as alleged, in this case. The other two cases cited by defendants (Mr. Macey's brief) are *Christiansen v. Beneficial National Bank*, 972 F. Supp. 681 (S.D. Ga. 1997), and *Rizzo v. H & R Block*, No. 95-1001 CV-W-$ (W.D. Mo. 1996).   But *Christianson*'s theory was different from that alleged here and counsel have shown no reason to defer to the finding in *Rizzo* that plaintiffs there had failed to adequately allege an enterprise in the face of Judge Zagel's conclusion that plaintiffs stated a RICO claim.   Defendants in reply refer to my decision in *Clark v. Robert W. Baird Co., Inc.*, 142 F. Supp.2d 1065 (N.D. Ill. 2001).   That decision involved far different facts from those alleged in these cases and does not support defendants' position.

contains no evidence), I cannot determine the likelihood that plaintiffs will succeed on these claims, if it were to turn out that defendants intentionally deceived plaintiffs over the lengthy period alleged, plaintiffs might well be able to satisfy even the demanding requirements of RICO.

Plaintiffs' allegations also include state claims. As the Seventh Circuit's opinion noted, before this settlement blocked further proceedings, a class action asserting claims for breach of fiduciary duty had been set to go to trial in Texas. Following the Seventh Circuit's opinion, that case was reset for trial. In November, the trial judge granted summary judgment in favor of plaintiffs on the breach of fiduciary duty claim, and awarded damages in the amount of $74,900,000. While defendants argued before that decision that even if plaintiffs won in the trial court in Texas, any decision would not hold up on appeal, almost immediately after the trial court ruled in favor of plaintiffs, Block agreed to a settlement of $49,000,000 in cash and various software and coupons.

Apart from the Texas case, while plaintiffs had not fared well on this claim (Judge Zagel had dismissed the claim in this case, and there is an Illinois appellate case reaching the same result), two recent cases had upheld claims under allegations similar to the facts alleged in these cases. Maryland's highest court, in a related case, held that Block had admitted that "it

acts as an agent for its customers for the purposes of preparing the tax return and filing it with the IRS." *Green v. H & R Block, Inc.,* 355 Md. 488, 735 A.2d 1039, 1049 (1999). Block also conceded that it acts as its customers' agent in transmitting the RAL application. *Id.* at 1050. While Block argued that its agency relationship terminated at that point, the court, comparing the taxpayer–H&R Block relationship with that of a typical attorney-client relationship, in which an attorney acting as a negotiator generally acts independently in determining strategy, although the client retains ultimate decision making authority, held that:

> Like the attorney representing a client in settlement negotiations, H & R Block undertakes to file customer tax returns with the IRS and the loan application with the bank, but only at the direction of the customer, who ultimately controls whether H & R Block takes either action with respect to the third party. It is not dispositive ... that H & R Block's customers do not generally exercise control over the manner in which H & R Block prepares the tax filings. Indeed, H & R Block conceded at oral argument that it serves as its customers' agent for the purpose of filing the tax return and transmitting the loan application to the lender. Thus, H & R Block's customers retain enough

control over H & R Block to support a finding of an agency relationship.

*Id.* at 1051. The court also concluded that although the customer ultimately signs the loan document, Block's role in the application process creates a reasonable inference "that H & R Block played an integral part in the customer's receipt of the bank loan, which indisputably has legal ramifications for the H & R Block customer and the bank." *Id.* at 1053. Finally, the court noted that Block's advertising "strives to convince potential customers that it can be 'trusted' to obtain both the highest and fastest possible refunds for its customers," and that its "advertisements promoting its ability to secure a 'Rapid Refund' constitutes an integral part of its promotional efforts." Id. The court concluded that Block "intended to create the circumstances under which customers would trust it to obtain the maximum refund fast" and customers may have "reasonably believed that H & R Block is operating as their broker ... finding for its customers the best loan package that fulfills H & R Block's twin commitments of maximizing tax refunds in terms of amount and speed." Id. at 1054.

The Pennsylvania appellate court also concluded that the facts of Block's relationship to its customers in obtaining RALs created a triable issue as to whether Block had a fiduciary duty to its RAL customers. That court concluded that the evidence was

"sufficient to make a *prima facie* showing that the Plaintiffs and Block engaged in a confidential relationship." *Basile*, 777 A.2d at 103. It noted that Block "actively sought customer trust in H & R Block as a corporate entity and in all of the services Block offered." Id. It further found that "[a]s documented by multiple focus group studies commissioned by Block, the company was aware of the limited economic and educational standing of its customers, their confusion about the 'Rapid Refund' service, and the fact that they trusted the company to 'take the worry out.'" Id. The court noted that a confidential relationship "may exist 'wherever one occupies toward another such a position of advisor or counsellor as reasonably to inspire confidence that he will act in good faith for the other's interest.'" Id. Finally, the court held that if plaintiffs established a fiduciary relationship, reliance would be presumed. Id. at 107.

Settlement counsel's statement that the Seventh Circuit was mistaken in taking seriously the breach of fiduciary claim and that these claims have "been consistently dismissed by courts for failure to state a cause of action" cannot be reconciled with these decisions nor with Block's settlement of the Texas case in an amount that exceeds the entire settlement in this case. Defendants argue that I have now carved out the Texas case from this one and so the settlement there does not affect the fairness of the settlement in this case. In the first place, while I

allowed the Texas case to proceed, the members of the Texas class will have to be sent a supplementary notice before they can actually be severed.[10]  Secondly, the opinions in Maryland and Pennsylvania might lead to reconsideration of the court's decision dismissing the fiduciary duty claim based on additional

---

[10] The value of the Texas settlement to Texas class members is unclear at this point. Counsel for Block stalled for weeks in providing any settlement agreement on the grounds that despite a press release from Block announcing the settlement, there was not yet a written settlement agreement, and then, in response to a further order to provide any writing having to do with the settlement, provided, in February, a "Memorandum of Understanding," dated November 18, 2002, which they claimed was not a settlement agreement.  That 13 page memorandum appears to contain every element of settlement, and is in form what would ordinarily be considered a settlement agreement.  Counsel have now submitted the final settlement agreement, which, indeed, contains the terms stated in the Memorandum of Understanding. Under the settlement, Block agrees to pay up to $49,000,000 to counsel (with court approval), with class members obtaining coupons entitling them to "discounts" on future services and computer software for tax services.    The agreement obligates counsel for the Texas plaintiffs to withdraw objections to the settlement before this court.  Subsequent to my receipt of the Memorandum of Understanding, Texas counsel submitted to the Texas court a "Motion for Release of Funds," which asked the Texas court to pay $26,000,000 of the $49,000,000 in "attorney fees" to the Texas class. In response to that motion, Block informed the Texas court that no one had yet filed an application for preliminary approval of the settlement, although the settlement had been agreed upon three months earlier. The allocation of attorneys fees to plaintiffs is not in the final settlement agreement.   There appear to be two possible scenarios: the Texas class was settled for almost $50,000,000 in attorneys' fees, with the class to receive nothing more than coupons of probably little value to at least most plaintiffs, or in fact the class – just one portion of the class in the present case – is itself to receive more than the entire settlement in the case before me but counsel are attempting to hide this fact until the present settlement is approved.

pleadings of the breach of fiduciary claim in this case.[11]
Finally, the Seventh Circuit's point primarily was that the
settlement did not seem to value the other cases that had upheld
these claims against motions to dismiss and that were subsumed
within the settlement. In hindsight, of course, the Seventh
Circuit was correct, as shown by the recent Texas settlement.
The Maryland case remains pending, and it must be assumed, given
Block's recent settlements of cases in Texas and New York that it
had (and if this settlement is not approved, has) value that is
likely to exceed the settlement in this case.[12] Given the
outcome of the *Haese* case in Texas, and the appellate opinions in
*Green* and *Basile*, defense counsel's dismissal of the fiduciary

---

[11] The Illinois appellate opinion that declined to find a
fiduciary duty owed by Block relied on *Peterson v. H & R Block
Tax Services, Inc.,* 971 F. Supp. 1204 (N.D. Ill. 1997), and
dismissed the claim before it based on the pleadings. *Beckett v.
H&R Block, Inc.,* 714 N.E. 2d 1040, 239 Ill. Dec. 736 (1st Dist.
1999). Judge Castillo thoroughly analyzed the claim before him
in *Peterson* but found only that on the facts alleged plaintiff
could not show an agency relationship. Neither opinion
forecloses a different outcome if the facts alleged would prove
an agency relationship. I also note that one of plaintiffs'
counsel, Mr. Harris, now seeks a court ordered modification of
the settlement to exclude state fiduciary claims in certain
states on the ground that these claims might succeed.

[12] The Pennsylvania case (*Basile*) also remains. Unlike the
Texas and Maryland cases, it was formally excluded from the
settlement. However, the Block customer claims against the banks
in Pennsylvania who provided the RALs are released by the
settlement. No one has addressed how that would affect the
claims against Block.

32

duty claims in this case as having only a 3 - 5 percent chance of success must be rejected.

Liability under TILA may also result in liability under state consumer fraud laws, which do not have caps on damages. Settlement counsel dismiss these claims as having only a 15 -20 percent chance of success with this analysis: "While it may be misrepresentation or fraud as to the amount of the fees, they knew they were paying fees and they got exactly what they intended and requested to receive. Therefore, there is probably no bait-and-switch because they did not get something different from what was expected." Report of Philip N. Hablutzel at 9.[13] Mr. Hablutzel does not refer to Judge Gershon's analysis or Judge Zagel's denial of the motions to dismiss in these cases. His argument also does not discuss what objecting plaintiffs claim were undisputed facts to the contrary in their motion for summary judgment in *Affatato*. Neither does Mr. Hablutzel (nor defendants) discuss the Maryland Court of Appeal's decision in *Green v. H&R Block*, 355 Md. 488, 735 A.2d 1039 (1999), which also held that similar allegations  regarding Block's RALs stated claims under that state's consumer fraud laws or the case brought by the New York Department of Consumer Affairs.

---

[13] As noted earlier, I have considered this report, and those of other lawyers/professors, as additional briefs.  I refer to it here because these reports are the principal basis on which settlement proponents claim the settlement is adequate.

None of the settlement proponents has attempted to value the injunctive aspect of this case although the Seventh Circuit had noted the failure to value and lack of discussion. Counsel for certain plaintiffs mention it only in a footnote and say it is impractical to assign a value. Other plaintiffs' counsel refer vaguely to injunctive relief and say only that it is "significant." Defendants never discuss it. The reason may be that there is not in fact an injunction requiring defendants to make any disclosures in the future. The settlement agreement does provide that defendants shall in the future disclose at the time of application for an RAL the amount of any license fee paid to Block, the customer's fees, and a TILA disclosure. Neither the agreement nor any other document in the court file, however, provide for a form of injunction, state how long the agreement to make these disclosures is to remain in effect, how prominent the disclosure must be, provide language of disclosure, or, for example, prohibit defendants from making any oral statement that would negate the written disclosure. Thus, the value of equitable relief is insignificant and probably nonexistent.

In summary, counsel for the settlement plaintiffs have been inadequate representatives of the plaintiff class for all of the reasons discussed in this opinion. Not surprisingly, therefore, they have failed to sustain their burden of showing that this settlement is fair. It is apparent that they do not have the

discovery necessary to provide a serious analysis of the chances of recovery on any theory in this case. They never attempted to obtain that discovery. Lacking this, their submissions in support of the settlement (and it should be remembered, counsel in one of these cases has now agreed that without modification the settlement should not be approved) have focused on decisions in which plaintiffs have lost and ignored altogether, or given short shrift to, those decisions that have found merit in claims raised in these cases. Defendants have been similarly unhelpful. Without adequate representation by plaintiffs' counsel, it is impossible to evaluate the chances of plaintiffs obtaining a greater recovery than under this settlement with any greater precision than noted in this opinion. Notably, in two cases that have settled since this settlement was submitted to me, defendants have been willing to pay substantially more than they agreed to pay in settlement of this case although only the present case would settle nationwide claims. Those settlements provide some concrete indication of defendants' recognition that their position may not be as strong as they and class proponents represent.

For each of these reasons, I decline to approve the settlement proposed to this court. Settlement counsel will not be permitted to continue to represent the class in this case. Other counsel seeking to represent the class shall be prepared to

make a presentation at a status hearing, to be set by separate order.

ENTER ORDER:

_Elaine P Bucklo_

**Elaine E. Bucklo**
United States District Judge

Dated: April 15, 2003